UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**FRANK BILAVER**,                              Case No. 1:12 CV 397

                Plaintiff,                    Judge James S. Gwin

     v.                                      REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL
SECURITY**,

              Defendant.                    Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Frank Bilaver seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). This case was referred to the undersigned for the filing of a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated February 17, 2012). For the reasons given below, the undersigned recommends affirming the Commissioner's decision denying benefits.

### BACKGROUND

On May 20, 2009, Plaintiff filed an application for DIB alleging a disability onset date of September 24, 2007. (Tr. 129). His claim was denied initially (Tr. 82), and on reconsideration (Tr. 89). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 98). Born January 6, 1967, Plaintiff was 44 years old when the hearing was held on April 7, 2011. (Tr. 25, 129). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 17, 25). In his Brief on the Merits, Plaintiff only challenges the ALJ's conclusions on his physical impairments (*see* Doc. 17), and therefore waives

any claims about the determinations regarding mental impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Therefore, the undersigned addresses only pertinent physical health records.

Vocational and Medical History

Plaintiff completed eighth grade in former Yugoslavia (now Croatia) and has not completed any additional training or school. (Tr. 34–35, 162). He came to the United States in 1986 and has prior work experience as a machine operator and group leader at CNC machining, which involved heavy lifting and supervisory duties. (Tr. 34, 143–46). On September 24, 2007 – his alleged onset date – Plaintiff was injured at work. (Tr. 215, 227). While carrying a 250 pound steel bar with a coworker, the other person dropped his end, and Plaintiff felt his back pull when he suddenly bore all the weight. (Tr. 215, 217, 227). This caused immediate back and neck pain, and when it did not improve, he saw Dr. Heather S. Mullen for medical care. (Tr. 217, 227). According to her notes, Plaintiff was in mild distress, with pain in his lumbar paraspinal muscles, paraspinal muscle spasms, pain on his left trapezius, a positive straight leg test, and could not toe or heel walk due to pain. (Tr. 227). He was diagnosed with an acute low back injury and possible radiculopathy. (Tr. 227).


In December 2007, Plaintiff continued to experience back pain related to his injury and requested pain medication. (Tr. 833). Lumbar spine x-rays from December 18, 2007 suggested non-acute L5 spondylosis, and cervical spine x-rays showed mild degenerative disc disease and mild right-side neural foraminal narrowing at C2-C3. (Tr. Tr. 895–97, 899–900). The same day, Plaintiff saw Dr. Jeffrey Kirschman for a medical visit associated with his workers compensation claim, presenting with diagnoses of a back sprain in the sacroiliac region, a sprained or strained cervical

2

spine, a sprained left shoulder, and lumbar spondylosis. (Tr. 215). Plaintiff was in no acute distress, but complained of ongoing radiating lower back pain with occasional numbness and difficulty walking, and ongoing mid-neck pain at C5-7, with radiation into his left arm. (Tr. 216, 219–20). Physical examination showed diffuse, mild swelling in Plaintiff's neck, with tenderness at C5-6 and a positive left Spurling's test. (Tr. 217). Due to pain in his neck, he had a decreased range of motion in his left shoulder. (Tr. 217). Plaintiff also had a tender lumbar spine region and an antalgic gait. (Tr. 217). Plaintiff's allowed conditions under the workers compensation claim were a sprain or strain of the cervical spine, left shoulder sprain, and lumbar spondylosis at L5, and he was referred for physical therapy. (Tr. 218–20). Dr. Kirschman reported Plaintiff could return to work with restrictions, stating he could lift up to ten pounds frequently and up to twenty pounds occasionally; never squat or kneel; occasionally bend, twist, reach below his knees, stand, or walk; frequently push or pull; and continuously sit. (Tr. 225). He further indicated Plaintiff could not climb ladders or work at unprotected heights. (Tr. 225).

On January 15, 2008, Plaintiff told Dr. Kirschman his condition was unchanged, and he complained of difficulty raising either arm above shoulder level due to pain occurring at C5-7. (Tr. 370). On January 22, 2008, an MRI of Plaintiff's lumbar spine showed multiple Schmorl's node endplate deformities, but no disc herniation, canal, or foraminal stenosis. (Tr. 247). Plaintiff went to physical therapy on January 29, 2008. (Tr. 240). He complained of pain radiating down his left leg, and he had a highly decreased range of motion. (Tr. 240–41). Plaintiff described his pain as eight out of ten at best and ten out of ten at worst. (Tr. 242). At the time, he was unable to do any physical work. (Tr. 242). Plaintiff attended only five physical therapy visits (Tr. 234, 237–40) and two aquatherapy visits (Tr. 235–36). On July 7, 2008, Plaintiff was discharged from physical therapy

because he stopped coming to his appointments. (Tr. 233).

In February, March, and April 2008, Plaintiff consistently reported his condition was unchanged, and he continued to experience radiating back pain, ongoing neck pain, and numbness with extended sitting, standing, or walking. (Tr. 266, 285, 350, 1279–80). He also continued to experience neck swelling, with maximal neck tenderness at C5-6. (Tr. 286). During this time, Dr. Kirschman still believed Plaintiff could perform light duties, with the same restrictions noted earlier. (*See* Tr. 225, 289, 404). In April 2008, Plaintiff had weakness in his left shoulder and a decreased range of motion, but Dr. Kirschman continued to opine Plaintiff could work with the same physical restrictions. (Tr. 267, 274, 350, 402).

On May 14, 2008, Dr. Kirschman's records state prednisone was helping Plaintiff's neck pain, though he still complained of stiffness in his neck and lower back. (Tr. 350). On May 19, 2008, an MRI of Plaintiff's cervical spine showed straightening of the cervical lordosis, left-sided disc herniation at C5-6 with left-sided foraminal narrowing, central and right disc herniation at C6-7, and disc herniation centrally at C3-4 and C4-5. (Tr. 244–45). Two days later, an MRI of Plaintiff's left shoulder showed supraspinatus tendinopathy and AC joint hypertrophy with no impingement. (Tr. 246). On May 23, 2008, Plaintiff attended a spine surgical consult, and notes indicate Plaintiff should request workers compensation to authorize an additional allowance for cervical disc herniation at C3-4, C4-5, C5-6, and C6-7 based on the MRI results. (Tr. 262). Plaintiff's condition still had not changed when he saw Dr. Kirschman on June 4 and June 25, 2008. (Tr. 369).

On July 24, 2008, Dr. Ryan D. Herrington reviewed Plaintiff for additional workers compensations allowances, including left-sided disc herniation at C5-6. (Tr. 393). He found the May

4

2008 MRI of Plaintiff's cervical spine "confirm[ed] the presence of the requested condition of left sided herniated disc at C5-6", but found the additional herniated disc at C6-7 indicated an age-related degenerative process, not a workplace injury. (Tr. 394).

On August 18, 2008, Plaintiff saw Dr. Timothy A. Moore for a consult. (Tr. 327). He reported significant issues with his neck, left arm, lower back, and left leg. (Tr. 327). Plaintiff also reported numbness and tingling in his left arm, difficulty performing fine motor skills with his left arm, significant lower back and left lower extremity pain, and described his pain as a seven to nine out of ten. (Tr. 327). He was in mild distress, rising cautiously from a seated position and walking with an antalgic gait on his left side. (Tr. 327). He had a positive straight leg raise test, left-sided weakness in his lower extremities, and decreased sensation on the left, but a fairly full, non-tender range of motion in his knees and ankles. (Tr. 327). Plaintiff was "globally weak" in his left upper arm, but had a fairly full, non-tender range of motion in both shoulders, elbows, and wrists. (Tr. 327). Dr. Moore noted a cervical spine MRI showing significant cervical spondylosis, but concluded Plaintiff's continued pain was of unknown etiology. (Tr. 327). He told Plaintiff he was unsure how to explain the symptoms, as he did not see the cervical spine MRI findings he expected with Plaintiff's symptoms. (Tr. 327).

On September 3, 2008, Plaintiff saw Dr. Kirschman complaining of ongoing neck pain with radiation. (Tr. 250). His condition was only improved with steroid medication. (Tr. 252). Dr. Kirschman again determined Plaintiff was not disabled from modified duty, assessing the same restrictions as earlier. (Tr. 253). On September 30, 2008, Plaintiff's complaints and pain patterns once again remained unchanged, and he requested stronger pain medication. (Tr. 308). He had no neck swelling, but his shoulder range of motion caused neck pain. (Tr. 312). On that date, at the end

5

of October 2008, and in mid-November 2008, Dr. Kirschman opined Plaintiff could return to work with the same restrictions. (Tr. 307, 400–01, 1210). In October 2008, Plaintiff's complaints and pain patterns remained unchanged, and treatment notes indicate his workers compensation claim for a herniated disc at C5-6 had been denied. (Tr. 1347).

Plaintiff saw treating physician Dr. Mahboob Quaderi on October 31, 2008, complaining of back pain at his annual physical examination. (Tr. 814–15).

On December 18, 2008, Dr. Ralph J. Kovach evaluated Plaintiff for the additional workers compensation allowance of herniated discs. (Tr. 405). Plaintiff reported pain in his posterior neck, occipital headaches, and pain in the back of both shoulders, but no radiation into his upper extremities. (Tr. 406). He also reported lower back pain with radiation into his left leg, intermittent loss of sensation in his lower extremities, and intermittent loss of feeling in both hands. (Tr. 406). Plaintiff walked with a slightly antalgic gait favoring his left leg. (Tr. 407). He had normal posture, with subjective tenderness at the paraspinal lumbar levels, but his range of motion in his back was good, with complaints only at the extremes of movement. (Tr. 407). Dr. Kovach "detected no loss of shoulder movement or shoulder atrophy." (Tr. 407). He detected no specific weakness in Plaintiff's upper or lower extremities, but Plaintiff had exquisite areas of tenderness in his neck and trapezius muscles, along with moderate tenderness in his lumbar region. (Tr. 407). He also had a positive straight leg raising test on the left. (Tr. 407). In Dr. Kovach's opinion, Plaintiff's herniated discs at C3-C7 were not symptomatic, and he detected no upper cervical radiculopathy. (Tr. 407).

On January 21, 2009, Dr. Kirschman assessed Plaintiff's "Workability Functional Capacity". (Tr. 411). The report notes Plaintiff's left cervical spine pain and left upper extremity paresthesias, lower back pain, and lower extremity pain and numbness. (Tr. 412). It also indicates Plaintiff lives

in a house with his family, can dress and wash independently, has difficulty shaving due to neck pain, and cannot cook, clean, or perform yard work. (Tr. 412). During the evaluation, Plaintiff had poor cervical spine range of motion, poor left shoulder elevation, poor lumbar spine range of motion, and poor right-sided toe and heel walking. (Tr. 412). His shoulder strength was 4/5 bilaterally, but his shoulders had very low strength. (Tr. 413). Plaintiff's other joint exams were all normal, but his agility was limited by his inability to fully bear weight on his left extremity. (Tr. 413).

Dr. Kirschman's report indicates Plaintiff's effort "was somewhat self-limited and inconsistent on many activities", such that his demonstrated abilities only partially substantiated his reported problems. (Tr. 415). Dr. Kirschman reported unusual or excessive symptoms reports, inconsistent weakness or strength, and abnormal function in an unaffected region. (Tr. 415). Overall, Dr. Kirschman concluded Plaintiff could perform a partial list of jobs with sedentary and light demands, further explaining he "would be best suited for jobs where he would be able to change positions, not be required to squat, bend more than occasionally, or lift more than 15 [pounds]". (Tr. 416).

Plaintiff presented to Dr. Kirschman's office on January 6, 2009, February 24, 2009, and April 7, 2009, reporting no changes in his condition. (Tr. 423–24). On February 24, 2009 and April 7, 2009, Dr. Kirschman noted Plaintiff could return to work with the same restrictions he noted on previous occasions, but noted these restrictions were permanent for Plaintiff's currently allowed conditions. (Tr. 436). On February 9, 2009, Dr. Kirschman wrote that he agreed with Dr. Kovach's opinion that Plaintiff had no cervical or lumbar radiculopathy present and also agreed with Dr. Kovach's lumbar examination. (Tr. 445). Overall, though, he recommended not accepting Dr. Kovach's opinion. (Tr. 454).

7

On April 15, 2009, pain-management doctor Vasantha K. Kumar diagnosed Plaintiff with displacement of cervical intervertebral disc without myelopathy and prescribed Neurontin for pain management. (Tr. 475). On May 5, 2009, Dr. Deborah Ewing-Wilson performed an EMG of Plaintiff's left lower and upper extremities, which revealed chronic mild left L5 radiculopathy, but no evidence of cervical radiculopathy or other neuropathy. (Tr. 483). On May 20, 2009, Dr. Kumar diagnosed Plaintiff with cervical radiculopathy and administered a cervical nerve block injection. (Tr. 539–40).

On May 26, 2009, Plaintiff reported to Dr. Kirschman's office. (Tr. 510). Notes indicate he planned on getting epidurals to treat his pain. (Tr. 512). Dr. Kirschman again reported Plaintiff could work with restrictions. (Tr. 538). Tests several days later showed no sign of arthritis in Plaintiff's hips, no sign of fracture, and no abnormal bone or soft tissue density. (Tr. 509). Plaintiff received a lumbar epidural steroid injection on June 18, 2009. (Tr. 507–08). On August 11, 2009, Plaintiff told Dr. Kirschman the epidural injections helped his lower back and left leg pain, but he continued to experience intermittent pain radiating down his leg and neck pain. (Tr. 572).

On September 28, 2009, Dr. Khalid B. Darr evaluated Plaintiff regarding his workers compensation claim and found tenderness, muscle guarding, and spasms in his cervical spine. (Tr. 852–53). His range of motion was limited, but no radiculopathy was present. (Tr. 852). Plaintiff's left shoulder had no tenderness, atrophy, scarring, deformity, or crepitance. (Tr. 852). On October 13, 2009, Dr. Kirschman reiterated his findings that Plaintiff is permanently limited to a restricted range of work. (Tr. 485). Office notes indicate Plaintiff has increased neck, lower back, and left leg discomfort in cooler weather. (Tr. 571).On October 26, 2009, another doctor evaluated Plaintiff for his workers compensation claim. (Tr. 583). Plaintiff ambulated very stiffly and slowly, and he had

8

palpable signs of spasm and tightness in his back. (Tr. 583). His sacroiliac spine range of motion was very limited. (Tr. 584). Plaintiff's upper extremities had normal reflexes, sensation, and motor function, with no muscle atrophy. (Tr. 584). His left shoulder range of motion was somewhat diminished, with "flexion 150 degrees, extension 40 degrees, abduction 150 degrees, adduction 30 degrees, internal and external rotation limited to 70 degrees each", but this amounted to only four percent whole person impairment (WPI). (Tr. 584).

On February 2, 2010, Plaintiff went to Dr. Kirschman and stated his symptoms were worse in cold weather. (Tr. 627). Notes indicate he was using a magnetic wrap on his neck. (Tr. 627). Dr. Kirschman assessed the same permanent restrictions on Plaintiff's ability to work as he did on numerous other occasions. (Tr. 640).          On May 19, 2010, Plaintiff saw Dr. Quaderi with diagnoses of chronic pain, chronic neck pain, lower back pain, and lumbar and cervical radiculopathy. (Tr. 800–01). Plaintiff reported ongoing neck and back pain radiating to his arms and legs, numbness, tingling, and weakness in his hands and wrist. (Tr. 802). His neck was very stiff, with a very limited range of motion, and his back also had a limited range of motion. (Tr. 802). Dr. Quaderi believed it was obvious Plaintiff has functional limitations. (Tr. 803).

On July 13, 2010, Plaintiff presented for a neurology consult with spasms and a limited range of motion in his neck and back. (Tr. 665, 672). He had an abnormal gait and some areas of decreased sensation, and it was difficult to test his strength due to his chronic pain. (Tr. 672–73). Dr. Karla J. Madalin increased some of Plaintiff's medication dosages and prescribed Lyrica. (Tr. 673). On November 9, 2010, Plaintiff returned to Dr. Kirschman's office, reporting increased tail bone pain when sitting for extended periods. (Tr. 1745). At this point, he was taking Vicodin three times a day to control his pain. (Tr. 1745). On December 1, 2010, Dr. Quaderi repeated Plaintiff's diagnoses of

9

chronic neck pain, lower back pain, chronic pain, and lumbar and cervical radiculopathy. (Tr. 1740).

Dr. Quaderi also prescribed medications. (Tr. 1740–41).

Residual Functional Capacity (RFC) Assessments and Physician Opinions

On November 25, 2009, Dr. Ralph Graham assessed Plaintiff's physical RFC. (Tr. 613–20). He opined Plaintiff has the following exertional limitations: He can lift ten pounds frequently and twenty pounds occasionally; stand or walk at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday but must periodically alternate sitting and standing; and is limited in his abilities to push or pull in his upper and lower extremities. (Tr. 614). Dr. Graham stated Plaintiff has cervical and lumbar degeneration, and he cited Plaintiff's cervical disc herniations. (Tr. 614). Dr. Graham also cited and gave great weight to Dr. Kirschman's opinion that Plaintiff is best suited for jobs where he can change positions and is not required to bend or squat more than occasionally or lift more than fifteen pounds. (Tr. 615, 619).

Dr. Graham also opined Plaintiff has the following postural limitations: He can frequently balance; occasionally climb ramps and stairs, stoop, and crawl; and never climb ladders, ropes, or scaffolds, kneel, or crouch. (Tr. 615). He found Plaintiff limited in reaching all directions, but unlimited in handling, fingering, or feeling and noted Plaintiff can only occasionally reach above shoulder-level with his left arm. (Tr. 616). Dr. Graham also stated Plaintiff should avoid hazards such as machinery and heights. (Tr. 617). Dr. Graham found Plaintiff's allegations only partially credible, stating he can walk between rooms without assistance, and further noting testing showed Plaintiff can lift more than he alleged. (Tr. 618).

Dr. Kirschman assessed Plaintiff's functional abilities in 2010. (Tr. 623). He listed Plaintiff's diagnoses of cervical disc herniations and lumbar spondylosis, noting Plaintiff has neck pain with

radicular symptoms and lower back pain, made worse with movement, lifting, and repetitive work. (Tr. 623). Dr. Kirschman also stated medication is only minimally effective at managing Plaintiff's pain and referenced the restrictions he placed on Plaintiff's ability to work from December 2007 forward. (Tr. 624).

On March 10, 2011, Dr. Quaderi evaluated Plaintiff's functional capacities, stating Plaintiff can stand, walk, or sit for only one hour in an eight-hour workday. (Tr. 1813). Dr. Quaderi opined Plaintiff can continuously lift ten pounds, but never more than that. (Tr. 1813). And Dr. Quaderi believed Plaintiff can never work above shoulder level, bend, twist, turn at the waist, crawl, climb, push, or pull, and can only occasionally squat. (Tr. 1813). The only explanation Dr. Quaderi offered for these opinions was to state "sitting/standing/walking for more than [an hour] each time is very difficult for him." (Tr. 1813).

ALJ Hearing

Plaintiff, represented by counsel, and a VE testified at the ALJ hearing on April 7, 2011. (Tr. 25). Plaintiff testified he has difficulty climbing stairs because he experiences sharp shooting pains in his back and neck and becomes dizzy. (Tr. 33). Plaintiff described his workplace injury, explaining he was eventually terminated from his position. (Tr. 39–40). Detailing his treatment history, Plaintiff testified he feels like a prisoner in his own house and described numerous symptoms, including back, neck, and shoulder pain, numbness, and dizziness. (Tr. 41–42, 44, 53, 56, 62). He also explained that at his doctors' recommendations, he walks every day for ten to fifteen minutes after taking pain medication. (Tr. 45–46). With medication, Plaintiff testified his pain is about a seven out of ten, and he said his pain is increasing over time. (Tr. 46). Specifically regarding his left shoulder, Plaintiff testified it becomes numb every day due to disc herniation. (Tr.

48). He also explained he experiences tail bone pain from extended sitting or laying down. (Tr. 48). Plaintiff testified he has not had surgery to repair his herniated discs because the discs are in a very sensitive area. (Tr. 50).

Plaintiff testified he has a current driver's license with no restrictions and drives, but is frightened to drive long distances from home. (Tr. 33, 66). After he gets up in the morning, he takes his medication, lays down, and then eats. (Tr. 62). Plaintiff spends his days laying on the couch and watching television, and his wife cooks for him. (Tr. 63). He tries to go outside every day, but cold weather worsens his conditions to the point he cannot do so. (Tr. 62–63).

Plaintiff also stated if he lifts something too far over his head, he gets a sharp pain in his neck, explaining his lifting difficulties are not due to how much something weighs, but to his limited shoulder range of motion. (Tr. 50–51). Plaintiff testified he lays down more than eight hours a day. (Tr. 55–56). He believed he could walk or stand for fifteen or twenty minutes on pain medication, and he thought he could sit for about an hour before needing to change positions. (Tr. 52, 54–55).

The ALJ asked the VE to assume a person of Plaintiff's age, education, and work experience, who could perform a limited range of light work with the following physical limitations: "no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs; no . . . work at unprotected heights; no work around dangerous machinery; just occasional rapid movement of the arms; occasional neck flexing; frequent push/pull with the left arm, and frequent overhead lifting." (Tr. 73). The VE testified such a person could not perform Plaintiff's past work, but could perform the jobs of mail clerk (200,000 jobs nationally; 5,000 in Ohio), housekeeping cleaner (500,000 jobs nationally; 30,000 in Ohio); and sales attendant (120,000 jobs nationally; 5,000 in Ohio). (Tr. 73–74)

12

The ALJ then asked the VE to keep those same limitations in mind, but changed the hypothetical so the person could only perform sedentary work with a sit/stand option every hour. (Tr. 74). The VE testified that if the person was on task during the sit/stand option, he could perform the jobs of charge account clerk (90,000 jobs nationally; 3,000 in Ohio); addresser (50,000 jobs nationally; 3,000 in Ohio); and food and beverage order clerk (90,000 jobs nationally; 4,000 in Ohio). (Tr. 74–75). In the third hypothetical, the VE testified there would be no jobs for a person with a sit/stand option every half hour who would be off-task. (Tr. 75). Addressing Plaintiff's attorney's hypotheticals, the VE testified a person could perform no jobs if he could only work for two hours a day, if the person was off-task 20 percent of the time, or if the person would be absent from work four days per month. (Tr. 75–76).

ALJ Decision

The ALJ found Plaintiff's date last insured to be December 31, 2012, and determined he has not engaged in substantial gainful activity since his alleged onset date. (Tr. 11). He found Plaintiff suffers from five severe impairments – lumbar sprain, degenerative disc disease of the cervical spine, shoulder tendinopathy, and major depressive disorder – but these impairments do not meet or medically equal a listing. (Tr. 11). After considering the record, the ALJ determined Plaintiff has the RFC to perform sedentary work, except he cannot climb ladders ropes or scaffolds and can only occasionally climb ramps or stairs; he "requires a stand/stand (sic) option every hour"; he must avoid all exposure to hazards including unprotected heights and dangerous machinery; he can occasionally make rapid arm movements or flex his neck; he can frequently push or pull with his left arm and reach overhead; and he cannot perform work involving quotas or fast paced work. (Tr. 13).

13

The ALJ detailed Plaintiff's symptom allegations and medication history, including the MRI that showed shoulder tendinopathy and his numerous spine impairments. (Tr. 13–14). The ALJ summarized Plaintiff's medical records in detail, mentioning x-ray results, the MRI showing cervical disc herniation, and a nerve study showing mild lumbar radiculopathy but no cervical radiculopathy. (Tr. 14). He also noted Dr. Moore's uncertainty as to the cause of Plaintiff's symptoms. (Tr. 14).

The ALJ gave great weight to Dr. Kirschman's opinion regarding Plaintiff's functional capabilities, finding his opinions supported Plaintiff's ability to perform sedentary work and were consistent with Dr. Kirschman's findings and the record as a whole. (Tr. 14). He gave little weight to Dr. Quaderi's opinion that Plaintiff can perform far less than sedentary work, reasoning the record contained few treatment notes from Dr. Quaderi and the doctor had cited no objective evidence to support his opinion. (Tr. 14). The ALJ gave moderate weight to the state agency opinion that Plaintiff can perform light work, finding he can only perform sedentary work but agreeing he can perform competitive work. (Tr. 15). Regarding the numerous workers compensation records detailing Plaintiff's level of disability, the ALJ gave the opinions little weight except "to the extent that they all show that the [Plaintiff] is capable of some competitive work." (Tr. 15). The ALJ also found Plaintiff's credibility reduced because his treatment has been conservative, which the ALJ found inconsistent with Plaintiff's reported symptoms. (Tr. 16). He also noted Plaintiff's mental health history indicated he could be exaggerating his pain, as well as the fact that Dr. Moore could not explain Plaintiff's level of pain. (Tr. 16).

The ALJ found Plaintiff incapable of performing past relevant work, but relied on VE testimony to find Plaintiff could perform jobs existing in significant numbers in the national economy. (Tr. 16–17). Thus, he found Plaintiff not disabled. (Tr. 17). The Appeals Council denied

review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can he perform past relevant work?

5. Can the claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if he satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ erred two ways. First, he alleges the ALJ erred because his RFC determination does not explain his decision to exclude cervical disc herniations as a severe impairment. (Doc. 8, at 8). Second, he argues the ALJ erroneously interpreted Dr. Kirschman's records as supporting a return to sedentary work when Dr. Kirschman's opinion was not based on all Plaintiff's impairments. (Doc. 8, at 9–11).

Severe Impairment

Plaintiff's first argument stems from the ALJ's obligation at step two of the disability

analysis to determine whether a claimant suffers a "severe" impairment – one which substantially limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009). But the regulations do not require the ALJ to designate each impairment as "severe" or "non-severe"; rather, the determination at step two is merely a threshold inquiry. 20 C.F.R. § 404.1520(a)(4)(ii). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 576 (quoting SSR 96-8p, 1996 WL 374184,  at *5) (emphasis in original). In other words, if a claimant has at least one severe impairment, the ALJ must continue the disability evaluation and consider all the limitations caused by the claimant's impairments, severe or not. And when an ALJ considers all a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments does not constitute reversible error. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Here, Plaintiff contends the ALJ erred because he failed to explain whether Plaintiff's disc herniations are severe at any step of the evaluation (Doc. 8, at 8–9), but the ALJ did not err. He found Plaintiff suffers from at least one severe impairment – indeed, he found Plaintiff suffers from five severe impairments. Therefore, reversible error would only have occurred if he failed to consider the limitations and restrictions imposed by all Plaintiff's limitations, including those he found non-severe. The ALJ did not discuss cervical disc herniations in his step two analysis (*see* Tr. 12–13),  but he did discuss the herniations in his RFC determination (Tr. 14). Specifically, he referenced the May 2008 MRI showing numerous cervical disc herniations in the paragraph explaining Plaintiff's "remaining exertional and postural limitations, as well as his limitations

17

against hazards, are all caused by [his] spine impairments." (Tr. 14). In fact, one of the severe impairments the ALJ found was "degenerative disc disease of the cervical spine" (Tr. 11). Thus, the ALJ considered Plaintiff's disc herniations, found some cervical spine issues were severe, and incorporated numerous exertional and postural limitations into his RFC based on that and Plaintiff's other spine conditions.

"[T]he mere diagnosis of an impairment does not indicate the severity of that impairment." *Mikesell v. Astrue*, 2012 WL 1288733 , *adopted by* 2012 WL 1288724 (N.D. Ohio 2012) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)). Because the ALJ found Plaintiff suffers from severe impairments and considered Plaintiff's cervical disc herniations in the remaining steps of the disability determination, any failure to find additional severe impairments does not constitute reversible error. *See Nejat*, 359 F. App'x at 577.

Treating Physician Rule

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242. A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r*

18

*of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2).[1] In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009). Good reasons are required even when the ALJ's conclusion may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows his physician has deemed him disabled and might be bewildered when told by an ALJ he is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.*

---

1. 20 C.F.R. § 404.1527(d)– the regulation section defining the treating physician rule – was recently renumbered to § 404.1527(c) due to revisions not affecting the provision or rule. 77 FR 10650, at * 10656 (Feb. 23, 2012). Many cases cite § 404.1527(d) to explain the rule but the undersigned will cite the current and correct citation throughout this recommendation.

Plaintiff alleges the ALJ improperly relied on the forms Dr. Kirschman completed for Plaintiff's workers compensation claim to conclude Dr. Kirschman supports sedentary work. He argues the ALJ should have given greater weight to Dr. Quaderi's much more restrictive opinion of Plaintiff's abilities. (Doc. 8, at 9–11). The error occurred, Plaintiff contends, because the ALJ failed to take into account that Dr. Kirschman's opinion only considered limitations imposed by the allowed conditions in Plaintiff's workers compensation claim. (Doc. 8, at 10). Thus, Plaintiff argues Dr. Kirschman's work restrictions were not based on all Plaintiff's impairments because his herniated discs and lumbar spondylosis were specifically disallowed for the workers compensation claim. (Doc. 8, at 10–11).

Despite Defendant's assertion (Doc. 10, at 9), the ALJ did not explicitly discuss the fact that Dr. Kirschman's functional evaluations were only based on Plaintiff's allowed conditions. However, this was not error because Dr. Kirschman's opinion – even if he did not take cervical disc herniations into account – was consistent with the record as a whole. As discussed above, the ALJ thoroughly considered Plaintiff's spine problems (including cervical spine disc herniations), he found degenerative disc disease of the cervical spine to be a severe impairment, and he incorporated limitations based on these impairments into the RFC.

Dr. Kirschman treated Plaintiff for several years after his injury, and throughout that time Dr. Kirschman consistently found Plaintiff could lift up to ten pounds frequently and up to twenty pounds occasionally, could occasionally bend, twist, reach below his knees, and stand or walk, could never squat or kneel, could frequently push or pull, could continuously sit, and could not climb ladders or work at unprotected heights. Although Dr. Kirschman's assessment did not expressly

20

consider cervical disc herniations because those were not allowed conditions, Dr. Kirschman's 2009 Workability Functional Capacity report specifically noted Plaintiff suffers left cervical spine pain. (Tr. 412). And the ALJ's RFC determination also expressly considered the herniations, taking into account the severe impairment of degenerative disc disease of the cervical spine. The ALJ found Dr. Kirschman's opinion consistent with the record as a whole, and determined a similar RFC that *did* account for Plaintiff's cervical spine issues. In fact, the ALJ's opinion was more restrictive than Dr. Kirschman's opinion in at least one way. By limiting Plaintiff to sedentary work, he found Plaintiff can never lift more than ten pounds. 20 C.F.R. § 404.1567(a).

Moreover, the ALJ did not err by assigning little weight to Dr. Quaderi's opinion. While Dr. Kirschman saw Plaintiff numerous times from December 2007 forward, Dr. Quaderi rarely treated Plaintiff for pain in connection to his injury. (Tr. 800–03, 814–15, 1740–41). At one visit, Dr. Quaderi was not certain of the etiology of Plaintiff's chronic pain, but felt Plaintiff had functional limitations. (Tr. 802–03). Dr. Quaderi assessed Plaintiff's functional abilities as less than sedentary, stating Plaintiff could never lift more than ten pounds; could stand, walk, or sit for only one hour in a workday; could never work above shoulder level, bend, twist, or turn at the waist, crawl, climb, push, or pull; and could only occasionally squat. (Tr. 1813). But Dr. Quaderi's opinion did not point to any objective findings supporting his opinion. He merely said "sitting/standing/wakling for more than [an hour] each time is very difficult for [Plaintiff]." (Tr. 1813).

Additionally, medical evidence in the record contradicts Dr. Quaderi's opinion regarding Plaintiff's inability to work above the shoulder, push, or pull. Though Plaintiff presented to doctors' appointments with decreased shoulder range of motion (*see, e.g.,* Tr. 240, 267, 352), Dr. Moore's

examination showed Plaintiff had a fairly full, non-tender range of motion in both shoulders despite weakness in his left upper extremity as compared to the right. (Tr. 327). Dr. Moore also found Plaintiff's pain was of unclear etiology and could not explain Plaintiff's symptoms. (Tr. 327). When Dr. Kirschman evaluated Plaintiff, he found Plaintiff's shoulders had low strength, but also noted unusual or excessive symptoms reports and inconsistent weakness or strength. (Tr. 413, 415). When Dr. Darr evaluated Plaintiff for workers compensation purposes, his left shoulder had no tenderness, atrophy, scarring, deformity, or crepitance and his range of motion was not diminished. (Tr. 852). And another workers compensation doctor found Plaintiff had a somewhat diminished left shoulder range of motion, but his upper extremities had normal reflexes, sensation, and motor function, and his left shoulder difficulties amounted to very little whole person impairment. (Tr. 584).

Physician opinions are only entitled to controlling weight if they are supported by sufficient clinical findings and consistent with the evidence. Dr. Quaderi saw Plaintiff very few times for chronic pain, could not determine the etiology of Plaintiff's symptoms, and did not support his opinion with any medical signs or laboratory findings. Furthermore, Dr. Quaderi's opinion is inconsistent with substantial medical evidence, including clinical findings stating Plaintiff's pain is of unclear etiology, his shoulder range of motion is only somewhat diminished, and he has signs of unusual or excessive symptom reports. Because the ALJ stated Dr. Quaderi's treatment notes do not provide objective evidence supporting his opinion and also noted objective evidence did not support Dr. Quaderi's opinion as strongly as it supported Dr. Kirschman's opinion, he gave good reasons for assigning Dr. Quaderi's opinion little weight.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, this Court finds

22

the Commissioner's decision denying SSI benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

                                    s/James R. Knepp, II
                              United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).